Craig M. Murphy, Esq.
California Bar No. 314526
craig@nvpilaw.com
MURPHY & MURPHY LAW OFFICES
4482 Market Street, Ste 407
Ventura, CA  93003
(805) 330-3393 Phone
(702) 369-9630 Fax
Attorney for Plaintiffs

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SHANNON KLINGELHOFFER and STEPHEN AVIGIAN, husband and wife, individually and as the parents of A.K., a minor;<br><br>Plaintiffs,<br>vs.<br><br>TARGET CORPORATION, a foreign corporation d/b/a TARGET; KEHE DISTRIBUTORS, LLC, a foreign limited-liability company; KEHE DISTRIBUTORS, INC., a foreign corporation; KEHE ENTERPRISES, LLC, a foreign limited-liability company; WORLD FINER FOODS, INC., a foreign corporation; and WORLD FINER FOODS, LLC, a foreign limited-liability company; DOES 1-10, inclusive; and ROE ENTITIES 1-10, inclusive,<br><br>Defendants. | Case No.:<br>Dept. No.:<br><br><br><br>**COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

COME NOW the Plaintiffs, Shannon Klingelhoffer and Stephen Avigian, husband and wife, individually and as parents of A.K., a minor, by and through their attorney of record, Craig Murphy, Esq. of Murphy & Murphy Law Offices, and allege and state as follows:

**PARTIES**

1. At all times relevant to this action, the Plaintiffs resided in San Francisco County, California. The Plaintiffs are therefore citizens of the State of California.

2. At all times relevant to this action, Defendant Target Corporation was a Minnesota corporation with its principal place of business located in Minneapolis, Minnesota. Target is therefore a citizen of the State of Minnesota. At all times relevant to this action, Target owned and operated the Target retail store located at 401 Kenilworth Drive, Petaluma, California.

3. At all times relevant to this action, Defendant KeHE Distributors, LLC, was a Delaware limited-liability company with its principal place of business in Naperville, Illinois. On information and belief, KeHE's only member is Brandon Barnholt, who resides in Naperville, Illinois. Therefore, KeHE Distributors, LLC is a citizen of the States of Illinois and Delaware.

4. At all times relevant to this action, Defendant KeHE Distributors, Inc., was a Delaware corporation with its principal place of business in Naperville, Illinois. Therefore, KeHE Distributors, Inc. is a citizen of the States of Delaware and Illinois.

5. At all times relevant to this action, Defendant KeHE Enterprises, LLC, was a Delaware corporation with its principal place of business in Naperville, Illinois. Therefore, KeHE Enterprises, LLC is a citizen of the States of Delaware and Illinois.

6. At all times relevant to this action, Defendant World Finer Foods, Inc. was a Delaware corporation with its principal place of business located in Bloomfield, New Jersey. World Finer Foods, Inc. is therefore a citizen of the States of Delaware and New Jersey.

7. At all times relevant to this action, Defendant World Finer Foods, LLC was a Delaware corporation with its principal place of business in Bloomfield, New Jersey. World Finer Foods, LLC is therefore a citizen of the States of Delaware and New Jersey.

8. DOES 1 through 10 inclusive are persons, and ROE ENTITIES 1 through 10 are corporations, related subsidiary or parent entities, associations, or business entities, whose true names and identities and capacities are unknown to Plaintiffs at this time.  The DOE Defendants are individual persons acting on behalf of or in concert with, or at the direction of, any of the Defendants.  The ROE Defendants may be corporations, associations, partnerships, subsidiaries, holding companies, owners, predecessor or successor entities, joint ventures, parent corporations, related business entities or the employer of any of the Defendants.  Each named Defendant and the DOE and ROE Defendants are legally responsible for the events and happenings stated in this Complaint, and thus proximately caused injury and damages to Plaintiffs. In particular, said DOE and ROE Defendants are responsible in full or in part for the manufacture, distribution, processing, preparation, contamination, and sale of the ingredients in and the I. M. Healthy brand SoyNut Butter sold to or by Defendants herein. Plaintiff will ask leave of this Court to insert the true names and capacities for such DOE and ROE Defendants when discovered to substitute those true names as defendants into these proceedings for said DOE and ROE Defendants.

**JURISDICTION AND VENUE**

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000.00, exclusive of costs, it is between citizens of different states, and because the Defendants have certain minimum contacts with the State of California such that maintenance of the suit in this district does not offend traditional notions of fair play and substantial justice.

10. Venue in the United States District Court for the Northern District of California is proper pursuant to 28 USC § 1391(a)(1) and (2) because the Defendants are subject to personal jurisdiction in this judicial district, and because a substantial part of the events or omissions giving rise to the Plaintiffs' claims and causes of action occurred in this judicial district.

**FACTS**

**The Outbreak**

11. In March 2017, the Food and Drug Administration (FDA) and the Centers for Disease Control and Prevention (CDC), along with state and local health officials, attributed a multi-state outbreak of Shiga toxin-producing *Escherichia coli* O157:H7 to I.M. Healthy brand SoyNut Butter.

12. Epidemiologic investigation by federal, state, and local public health officials, including Centers for Disease Control and Prevention (CDC) and Food and Drug Administration (FDA), found that at least 32 people had acquired *E. coli* O157:H7 infections by consuming contaminated I.M. Healthy SoyNut Butter. This included residents of Arizona (4), California (5), Florida (2), Illinois (1), Massachusetts (1), Maryland (1), Missouri (1), New Jersey (1), Oregon (11), Virginia (2), Washington (2), and Wisconsin (1). Twelve individuals were hospitalized due to their infection, and nine developed hemolytic uremic syndrome (HUS).

13. The I.M. Healthy brand of soy nut butter products identified as the contaminated food item in this outbreak were produced jointly by The SoyNut Butter Company and Dixie Dew Products, Inc., at a facility owned by Dixie Dew in Kentucky. On March 28, 2017, once the epidemiologic investigation described previously had identified I.M.

Healthy brand soy nut butter products as the source of the outbreak, the Food and Drug Administration (FDA) conducted a comprehensive investigation at the Dixie Dew facility. Among other things, the FDA found:

    a.    grossly insanitary conditions;

    b.    food contact surfaces, floors, walls, and ceilings in the soy nut butter processing and packaging rooms were heavily coated with soy nut butter build-up from previous production runs;

    c.    that Dixie Dew does not routinely wash and sanitize smaller pipes, pipe fittings, gaskets, seals, "or the rubber _____ plug" when broken down following a production run;

    d.    that Dixie Dew does not conduct a kill step for SoyNut Butter product remaining in its mixing kettle leftover from a production run;

    e.    that certain equipment in the facility routinely shuts off during processing—approximately one to two times per day—and that the problem has persisted for approximately 15 years despite repeated maintenance intended to correct the problem;

    f.    that a thermometer used during the production of the subject product has never been verified for accuracy;

    g.    that a temperature probe and chart recorder used during the production process for the subject product does not function properly and has not been used for well over a year;

    h.    that Dixie Dew's food safety testing program is problematic—among other things, due to the failure to

Murphy & Murphy Law Offices
4482 Market Street, Ste 407
Ventura, California 93003
Telephone (805) 330-3393
Facsimile (702) 369-9630

                perform microbial testing where necessary to identify possible food contamination;

    i. that FDA inspectors found that testing materials on hand at Dixie Dew had expired in July 2016 and October 2015.

    j. that Dixie Dew had a fly infestation problem, and that small apparent flies and fly larvae, too numerous to count, were inside an unplugged chest freezer;

14. On March 4, 2017, as a result of epidemiologic and environmental evidence indicating that its soy nut butter products were the source of the outbreak, The SoyNut Butter Company recalled I.M. Healthy Original Creamy Soy Nut Butter with "best by" dates July 5, August 30, and August 31, 2018. This recall also included individual portion cups of the same product with best by dates in July, August, and November 2018.

15. On March 7, 2017, The SoyNut Butter Company expanded its recall to include all varieties of I.M. Healthy soy nut butters and all varieties of I.M. Healthy granola products, regardless of production or best by date.

16. Plaintiff was one of multiple individuals to make a claim for personal injuries against The SoyNut Butter Company and Dixie Dew as a result of this outbreak. Both companies filed for Chapter 7 bankruptcy, and the assets of these companies available to satisfy personal injury claims arising from this outbreak, including Plaintiffs', were insufficient to fairly compensate the claimants.

17. At all times relevant to this action, Defendants KeHE Distributors, LLC, KeHE Distributors, Inc., and KeHE Enterprises, LLC were all alter egos of one another and are referred to collectively as "Defendant Kehe" in this complaint. These entities jointly or independently distributed I.M. Healthy SoyNut Butter. On information

1 and belief, Brandon Barnholt is a primary member and/or officer of all
2 of these entities. There thus exists a unity of interest and ownership
3 between these related entities, the exact relationship of which is not
4 fully known by Plaintiffs, and all are liable in this action.

5   18. At all times relevant to this action, Defendants World Finer
6 Foods, Inc. and World Finer Foods, LLC were alter egos of one another
7 and are referred to collectively as "Defendant World Finer" in this
8 complaint. These entities jointly or independently distributed I.M.
9 Healthy SoyNut Butter. On information and belief, Brandon Barnholt is a
10 primary member and/or office of all of these entities. There thus
11 exists a unity of interest and ownership between these related
12 entities, the exact relationship of which is not fully known by
13 Plaintiffs, and both are liable in this action.

14   19. Defendants Kehe and World Finer are distributors of various food
15 products to retail stores and foodservice locations nationally.
16 Defendants Kehe and World Finer each acquired and distributed recalled
17 soy nut butter products, including to Target and other retail stores
18 nationally.

19   20. With regard to the contaminated jar of I.M. Healthy Soy Nut
20 Butter that Plaintiffs purchased at Target, as described below, World
21 Finer acquired this product from The SoyNut Butter Company and
22 distributed it to Kehe.  Kehe then distributed the product to the
23 Target store location where Plaintiffs purchased it.

24 ***E. coli* O157:H7**

25   21. *E. coli* is an archetypal commensal bacterial species that lives
26 in mammalian intestines. *E. coli* O157:H7 is one of thousands of
27 serotypes *Escherichia coli*. The combination of letters and numbers in
28 the name of the *E. coli* O157:H7 refers to the specific antigens

1    (proteins which provoke an antibody response) found on the body and
2    tail or flagellum respectively and distinguish it from other types of
3    *E. coli*. Most serotypes of *E. coli* are harmless and live as normal
4    flora in the intestines of healthy humans and animals. The *E. coli*
5    bacterium is among the most extensively studied microorganism. The
6    testing done to distinguish *E. coli* O157:H7 from its other *E. coli*
7    counterparts is called serotyping. Pulsed-field gel electrophoresis
8    (PFGE), sometimes also referred to as genetic fingerprinting, is used to
9    compare *E. coli* O157:H7 isolates to determine if the strains are
10   distinguishable. A technique called multilocus variable-number tandem
11   repeat analysis (MLVA) is used to determine precise classification when
12   it is difficult to differentiate between isolates with
13   indistinguishable or very similar PFGE patterns.
14   22.    *E. coli* O157:H7 was first recognized as a pathogen in 1982 during
15   an investigation into an outbreak of hemorrhagic colitis associated with
16   consumption of hamburgers from a fast food chain restaurant.
17   Retrospective examination of more than three thousand *E. coli* cultures
18   obtained between 1973 and 1982 found only one (1) isolation with
19   serotype O157:H7, and that was a case in 1975. In the ten (10) years
20   that followed there were approximately thirty (30) outbreaks recorded
21   in the United States. This number is likely misleading, however,
22   because *E. coli* O157:H7 infections did not become a reportable disease
23   in any state until 1987 when Washington became the first state to
24   mandate its reporting to public health authorities. As a result, only
25   the most geographically concentrated outbreak would have garnered
26   enough notice to prompt further investigation.
27   23.    *E. coli* O157:H7's ability to induce injury in humans is a result
28   of its ability to produce numerous virulence factors, most notably

Shiga-like toxins. Shiga toxin (Stx) has multiple variants (e.g. Stx1, Stx2, Stx2c), and acts like the plant toxin ricin by inhibiting protein synthesis in endothelial and other cells. Shiga toxin is one of the most potent toxins known. In addition to Shiga toxins, *E. coli* O157:H7 produces numerous other putative virulence factors including proteins, which aid in the attachment and colonization of the bacteria in the intestinal wall and which can lyse red blood cells and liberate iron to help support *E. coli* metabolism.

24. *E. coli* O157:H7 evolved from enteropathogenic *E. coli* serotype O55:H7, a cause of non-bloody diarrhea, through the sequential acquisition of phage-encoded Stx2, a large virulence plasmid, and additional chromosomal mutations. The rate of genetic mutation of *E. coli* O157:H7 indicates that the common ancestor of current *E. coli* O157:H7 clades likely existed some 20,000 years ago. *E. coli* O157:H7 is a relentlessly evolving organism, constantly mutating and acquiring new characteristics, including virulence factors that make the emergence of more dangerous variants a constant threat. The CDC has emphasized the prospect of emerging pathogens as a significant public health threat for some time.

25. Although foods of a bovine origin are the most common cause of both outbreaks and sporadic cases of *E. coli* O157:H7 infections, outbreak of illnesses have been linked to a wide variety of food items. For example, produce has, since at least 1991, been the source of substantial numbers of outbreak-related *E. coli* O157:H7 infections. Other unusual vehicles for *E. coli* O157:H7 outbreaks have included unpasteurized juices, yogurt, dried salami, mayonnaise, raw milk, game meats, sprouts, and raw cookie dough.

26. According to a recent study, an estimated 93,094 illnesses are

due to domestically acquired *E. coli* O157:H7 each year in the United States. Estimates of foodborne acquired O157:H7 cases result in 2,138 hospitalizations and 20 deaths annually. The colitis caused by *E. coli* O157:H7 is characterized by severe abdominal cramps, diarrhea that typically turns bloody within twenty-four (24) hours, and sometimes fevers. The incubation period—which is to say the time from exposure to the onset of symptoms—in outbreaks is usually reported as three (3) to four (4) days but may be as short as one (1) day or as long as ten (10) days. Infection can occur in people of all ages but is most common in children. The duration of an uncomplicated illness can range from one (1) to twelve (12) days. In reported outbreaks, the rate of death is 0-2%, with rates running as high as 16-35% in outbreaks involving the elderly, like those that have occurred at nursing homes.

27. What makes *E. coli* O157:H7 remarkably dangerous is its very low infectious dose, and how relatively difficult it is to kill these bacteria. Unlike *Salmonella*, for example, which usually requires something approximating an "egregious food handling error, *E. coli* O157:H7 in ground beef that is only slightly undercooked can result in infection," as few as twenty (20) organisms may be sufficient to infect a person and, as a result, possibly kill them. And unlike generic *E. coli*, the O157:H7 serotype multiplies at temperatures up to 44°F, survives freezing and thawing, is heat resistant, grows at temperatures up to 111°F, resists drying, and can survive exposure to acidic environments.

28. And, finally, to make it even more of a threat, *E. coli* O157:H7 bacteria are easily transmitted by person-to-person contact. There is also the serious risk of cross-contamination between raw meat and other food items intended to be eaten without cooking. Indeed, a principle

and consistent criticism of the USDA *E. coli* O157:H7 policy is the fact that it has failed to focus on the risks of cross-contamination versus that posed by so-called improper cooking. With this pathogen, there is ultimately no margin of error. It is for this precise reason that the USDA has repeatedly rejected calls from the meat industry to hold consumers primarily responsible for *E. coli* O157:H7 infections caused, in part, by mistakes in food handling or cooking.

**Hemolytic Uremic Syndrome (HUS)**

29. *E. coli* O157:H7 infections can lead to a severe, life-threatening complication called hemolytic uremic syndrome ("HUS"). HUS accounts for the majority of the acute and chronic illness and death caused by the bacteria. HUS occurs in 2-7% of victims, primarily children, with onset five to ten days after diarrhea begins. It is the most common cause of renal failure in children. Approximately half of the children who suffer HUS require dialysis, and at least 5% of those who survive have long-term renal impairment. The same number suffers severe brain damage. While somewhat rare, serious injury to the pancreas, resulting in death or the development of diabetes, can also occur. There is no cure or effective treatment for HUS. And, tragically, as too many parents can attest, children with HUS too often die.

30. HUS is believed to develop when the toxin from the bacteria, known as Shiga-like toxin (SLT), enters the circulation through the inflamed bowel wall. SLT, and most likely other chemical mediators, attach to receptors on the inside surface of blood vessel cells (endothelial cells) and initiate a chemical cascade that results in the formation of tiny thrombi (blood clots) within these vessels. Some organs seem more susceptible, perhaps due to the presence of increased numbers of receptors, and include the kidney, pancreas, and brain. By

1    definition, when fully expressed, HUS presents with the triad of
2    hemolytic anemia (destruction of red blood cells), thrombocytopenia
3    (low platelet count), and renal failure (loss of kidney function).
4    31.    As already noted, there is no known therapy to halt the
5    progression of HUS. HUS is a frightening complication that, even in the
6    best American centers, has a notable mortality rate. Among survivors,
7    at least five percent will suffer end stage renal disease (ESRD) with
8    the resultant need for dialysis or transplantation. But "[b]ecause
9    renal failure can progress slowly over decades, the eventual incidence
10   of ESRD cannot yet be determined." Other long-term problems include the
11   risk for hypertension, proteinuria (abnormal amounts of protein in the
12   urine that can portend a decline in renal function), and reduced kidney
13   filtration rate. Other long-term problems include the risk for
14   hypertension, proteinuria (abnormal amounts of protein in the urine
15   that can portend a decline in renal function), and reduced kidney
16   filtration rate. Since the longest available follow-up studies of HUS
17   victims are 25 years, an accurate lifetime prognosis is not really
18   available and remains controversial. All that can be said for certain
19   is that HUS causes permanent injury, including loss of kidney function,
20   and it requires a lifetime of close medical monitoring.

**A.K.'s *E. coli* O157:H7 Infection**

22   32.    The Plaintiffs purchased multiple jars of I.M. Healthy SoyNut
23   Butter that caused the injuries giving rise to this Complaint on
24   January 11 and January 30, 2017, from Target stores located in the area
25   of San Francisco, California. A.K. consumed product from these jars on
26   several occasions in the days leading up to the onset of his illness.
27   At least one of these jars of soy nut butter was contaminated by *E.*
28   *coli* O157:H7, causing A.K.'s severe illness.

33. On or about February 1, 2017, A.K. developed abdominal cramps, diarrhea, and other flu-like symptoms. His condition worsened over the next several days.

34. On February 4, 2017, A.K.'s illness had become so severe that his parents sought medical care in the emergency department at Kaiser Medical Center San Francisco. He was hospitalized for several days.

35. While in the hospital, A.K. underwent surgery for a preoperative diagnosis of intestinal intussusception. A stool sample submitted while he was in the emergency department eventually tested positive for Shiga toxin 2 and *E. coli* O157.

36. A.K. was discharged on February 6, 2017. He continued to have follow-up appointments for several weeks afterwards with his pediatrician to monitor his system for continued adverse effects of his *E. coli* infection.

## COUNT I

### (Strict Products Liability)

37. The Plaintiffs incorporate the preceding paragraphs of this Complaint, by this reference, as if each of these paragraphs were set forth here in its entirety.

38. The Defendants distributed and sold the contaminated I.M. Healthy SoyNut Butter product that the Plaintiffs purchased on January 11 and 30, 2017, from Target stores in the San Francisco area, which caused A.K.'s illness and injuries. This product will hereafter be called the "subject product."

39. The Defendants, and each of them, regularly purchased, distributed, and sold I.M. Healthy SoyNut Butter products. The Defendants, and each of them, purchased, distributed, and sold the subject product.

Murphy & Murphy Law Offices
4482 Market Street, Ste 407
Ventura, California 93003
Telephone (805) 330-3393
Facsimile (702) 369-9630

40. Food that is contaminated by *E. coli* O157:H7 is unsafe when put to its reasonably foreseeable use considering the nature of the product. Namely, *E. coli* O157:H7 contaminated food is unfit for human consumption.

41. The subject product was contaminated by *E. coli* O157:H7 when it left the control of the Defendants. A.K.'s consumption of the contaminated food caused him to become infected by *E. coli* O157:H7 and to suffer injuries as a direct and proximate result of that consumption.

42. The Defendants are strictly liable to the Plaintiffs for the harm proximately caused by the distribution and sale of an unsafe and defective food product.

**COUNT II**

**(Negligence)**

43. The Plaintiffs incorporate by reference and makes a part of this Count each and every foregoing paragraph of this Complaint.

44. The Defendants had a duty to comply with all statutory and regulatory provisions that pertained or applied to the distribution, storage, labeling, and sale of the food products that injured A.K., including the applicable provisions of the Federal Food, Drug and Cosmetic Act, and similar California food and public health statutes, including without limitation the provisions of the California Health & Safety Code Article 5, all of which prohibit the sale of any food that is adulterated, or otherwise injurious to health.

45. The subject product was adulterated within the meaning of the Federal Food, Drug and Cosmetic Act, and similar California statutes, because it contained a deleterious substance that rendered it injurious to health, i.e., *E. coli* O157:H7 bacteria.

46. The Defendants violated federal, state, and local food safety regulations by their sale of adulterated food. These federal, state, and local food safety regulations are applicable here, and establish a positive and definite standard of care in the sale of food. The violation of these regulations constitutes negligence as a matter of law.

47. A.K. is in the class of persons intended to be protected by these statutes and regulations, and A.K. was injured as the direct and proximate result of the Defendants' violation of applicable federal, state, and local food safety regulations.

48. The Defendants were negligent in the distribution and sale of a food product that was adulterated with *E. coli* O157:H7, not fit for human consumption, and not reasonably safe because adequate warnings or instructions were not provided.

49. The Defendants had a duty to sell food products that were from reliable sources and that were clean, wholesome, free from adulteration and fit for human consumption, but failed to do so, and therefore breached that duty.

50. The Defendants were negligent in the selection of suppliers, or other agents or subcontractors, and failed to adequately supervise them, or provide them with adequate standards, and, as a result, sold food that was adulterated with *E. coli* O157:H7.

51. The Defendants' various acts and omissions of negligence proximately caused A.K.'s *E. coli* O157:H7 infection and related illness, injuries, and damages.

**COUNT III**

**(Breach of Express and Implied Warranties)**

52. The Plaintiffs incorporate the preceding paragraphs of this

Complaint, by this reference, as if each of these paragraphs were set forth here in its entirety.

53. By offering I.M. Healthy SoyNut Butter products for sale to the public, Defendants impliedly warranted that such products were safe to eat, that they were not adulterated with a deadly pathogen, and that the products had been safely prepared under sanitary conditions.

54. The Defendants breached these implied warranties by distributing and selling the subject product, because it was contaminated by *E. coli* O157:H7.

55. Further, the label of I.M. Healthy SoyNut Butter promises that consumers will be "Healthy" if they purchase and consume the soy nut butter.

56. By assuring the Plaintiffs that the I.M. Healthy soy nut butter was healthy and that it was a "natural product," Defendants expressly warranted that the food that they sold, distributed and supplied was fit for the Plaintiffs' consumption.

57. Defendants breached their express warranty as described above in that the food that they sold, distributed and supplied was not fit for Plaintiffs' consumption.

58. The Plaintiffs' injuries proximately and directly resulted from the Defendants' breach of express and implied warranties, and the Plaintiffs are thus entitled to recover for all actual, consequential, and incidental damages that flow directly and in a foreseeable fashion from these breaches.

**PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs pray as follows:

(1) That the Court award the Plaintiffs judgment against Defendants for damages.

(2) That the Court award all such other sums as shall be determined to fully and fairly compensate the Plaintiffs for all general, special, incidental, and consequential damages incurred, or to be incurred, by the Plaintiffs as the direct and proximate result of the acts and omissions of the Defendants;

3) That the Court award the Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred;

4) That the Court award the Plaintiffs the opportunity to amend or modify the provisions of this Complaint as necessary or appropriate after additional or further discovery is completed in this matter, and after all appropriate parties have been served; and

(5) That the Court award such other and further relief as it deems necessary and proper in the circumstances.

**JURY TRIAL DEMAND**

The Plaintiffs demand trial by jury on all issues raised herein.

DATED June 13, 2019.

MURPHY & MURPHY LAW OFFICES

_____
Craig Murphy, Esq.
California Bar No. 314526
4482 Market Street, Ste 407
Ventura, CA 93003
(805) 330-3393 Phone
(702) 369-9630 Fax
Attorney for Plaintiff

Murphy & Murphy Law Offices
4482 Market Street, Ste 407
Ventura, California 93003
Telephone (805) 330-3393
Facsimile (702) 369-9630